# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF MISSISSIPPI
# EASTERN DIVISION

**ROBERT ELLIS, JR.**                                                                             **PLAINTIFF**

**v.**                                              **No. 1:07CV124-A-A**

**COLUMBUS CITY POLICE DEPARTMENT, ET AL.**              **DEFENDANTS**

## REPORT AND RECOMMENDATION

On June 11, 2009, plaintiff Robert Ellis, Jr. (# 26607), an inmate in the custody of the Mississippi Department of Corrections and housed in the Holmes-Humphreys County/Regional Correctional Facility, appeared before the undersigned for an evidentiary hearing to determine the merits of his claim filed under 42 U.S.C. § 1983. The plaintiff was incarcerated when he filed this suit, which is thus governed by the Prison Litigation Reform Act.[1] The court has previously dismissed Ellis's claims of excessive force regarding the defendants' attempts to remove a bag of cocaine from his mouth just after his arrest. The plaintiff's sole remaining claim is that the defendants used excessive force by using a Taser to subdue him during his arrest. The matter is ripe for resolution. For the reasons set forth below, the undersigned recommends that judgment be entered for the defendants on this sole remaining claim.

## Facts

The court has determined the facts set forth below by accepting the testimony and evidence from the credible witnesses – and discounting the testimony of the witnesses who did not prove credible. A discussion of the credibility of the various witnesses is set forth in its own section below. Although the court has already ruled on the plaintiff's claims arising out of the

---

[1] 28 U.S.C. § 1915(g).

events captured on video, the facts set forth below include all events in the interest of completeness.

Late during the night of May 3, 2006, and into the next morning, Robert Ellis, Jr. was drinking liquor at a party. Ellis then borrowed someone's car, picked up two friends, and went for a ride. During the ride, Ellis passed a police car going in the opposite direction a few blocks from the Columbus City Police Department Command Center. The police officer, Ryan Woods, noticed that Ellis was not driving properly and suspected that he was driving under the influence of alcohol. Woods notified dispatch, turned his police car around, and activated his blue lights in an effort to stop Ellis. Ellis did not pull over immediately; instead, he made several loops around the block with the door open, obviously looking for a place to stop the car and run. Officer Woods radioed the other units responding to back him up to let them know that the suspect appeared ready to bail out of the vehicle and run.

Ellis then stopped his car and fled the scene on foot toward a back yard and a forested area, leaving his friends in the car. Officer Woods pursued Ellis on foot thirty yards or so until Ellis fell onto his back in a ditch. Woods drew his Taser and ordered Ellis to roll onto his stomach and put his hands behind his back. Ellis refused and lunged at Officer Woods, who deployed the Taser, but only one probe struck Ellis. For this reason, the Taser caused Ellis pain but did incapacitate him. Ellis attempted to flee again; Officer Woods pursued Ellis, tackled him near the back yard, and the two men struggled, both becoming entangled in the Taser wires. In his struggle with Ellis, Woods could use only one arm; he used his other arm to keep Ellis from gaining control of the Taser, which would have shocked both of them at that point. Officer Woods could not radio his backup to tell them his location because he was trying to restrain Ellis

with one hand, while keeping the Taser secure in the other.

Officer Kelvin Lee arrived on the scene moments later. Officer Woods shouted for assistance from Officer Lee, but Wade Beard, a K-9 Unit officer who works narcotics, arrived first to assist in apprehending Ellis. Officer Lee then arrived to assist. Together, Woods and Beard got Ellis to his knees and restrained him in handcuffs. At some point during these events, Lieutenant Lewis also arrived on scene. Once Ellis was restrained in cuffs, Officer Lee returned to secure the vehicles and check on Ellis' two passengers.

While restraining Ellis, Officer Beard noticed that Ellis had something in his mouth. At this point, the officers moved Ellis to the front of Lt. Lewis' patrol car to ensure everything that transpired thereafter was recorded on the dashboard camera. During their attempts to keep Ellis from swallowing the bag of cocaine, the officers told him to "spit it out" over fifty times, while squeezing his throat and holding his nose. When these tactics did not work by themselves, Lt. Lewis ordered Officer Woods to use the Taser in "drive stun" mode[2] in a further attempt to gain Ellis' compliance. Despite the obvious pain of the Taser, Ellis continued chewing the bag of cocaine and attempting to swallow it. Soon, the bag burst, and cocaine was visible in his mouth, on his lips, and on the hood of the patrol car. Officer Beard then radioed dispatch and requested

---

[2]A Taser normally operates by firing two darts at the subject. The darts penetrate the skin of the subject and remain connected to the Taser through small wires, providing a path for electricity to pass into the subject through one wire – and path for current to return to the Taser through the other wire. When an officer activates the Taser by pulling the trigger, the subject is immobilized by the application of an extremely high voltage.
In "drive stun" mode, however, the officer removes the faceplate of the Taser which contains the two probes and, instead, physically touches the suspect with the two probes protruding from the Taser's face. Drive stunning does not incapacitate or damage a suspect, but it does cause pain as long as the Taser's trigger is pulled. Once the trigger is released during drive stun use, the Taser's effects immediately stop.

an ambulance.  Beard and the other officers persisted in their attempts to get Ellis to spit out the cocaine,  repeatedly telling Ellis that if he swallowed the cocaine in the bag, he could have a heart attack and die.  Ellis, however, kept chewing the bag and attempting to swallow it.  Officer Woods employed the Taser once again in an attempt to convince Ellis to spit out the bag of cocaine, to no avail.  At this point, Lt. Lewis, who was out of breath from his attempts to hold the uncooperative suspect still while the others tried to remove the bag of cocaine, said, "Hold it," but it does not appear that Officer Woods heard him or understood that Lewis meant to halt all use of the Taser.  After further attempts to retrieve the bag failed, Officer Woods used the Taser in drive stun mode in a final attempt to compel Ellis to spit out the cocaine.  Lt. Lewis then gave a clear order for Woods to holster the Taser, and he did so.

Eventually, Ellis started losing motor control and became glassy-eyed.  The officers lowered Ellis to the ground because he lost the ability to stand on his own.  When the ambulance arrived shortly thereafter, Ellis was on the ground.  Someone had informed the ambulance personnel that Ellis had ingested cocaine, was having difficulty breathing, and was at great risk of choking on the plastic bag.  The emergency medical technician attempted the Heimlich maneuver, but the bag did not come out of Ellis' mouth.  Ellis was then placed in the ambulance, which began its trip to the hospital.  A very short time later, Ellis stopped breathing; the ambulance driver pulled over, and the medical personnel used forceps to remove the bag from Ellis' trachea.  Ellis resumed breathing, and the ambulance delivered Ellis to the hospital. During Ellis' stay at the hospital, his girlfriend told hospital personnel that Ellis had ingested about eight grams of cocaine.  His blood alcohol content was 0.218, and he tested positive for the presence of cocaine in his system.  Ellis's treating physician's impression was that he suffered

from ethanol intoxication and acute large cocaine ingestion. Ellis was treated at the hospital, recovered, and released two days later on May 6, 2006.

## Credibility of Witnesses

The court finds the testimony of Officer Wade Beard, Officer Kelvin Lee, and Lieutenant Oscar Lewis, Emergency Medical Technician and ambulance driver Katherine Gammon, and Penny Young, the records manager for the hospital (all of whom testified at the evidentiary hearing) to be credible. The answers these witnesses gave to the questions asked were direct, generally without hesitation, and were consistent with the testimony of the other witnesses, the video recording of the incident, the transcript of the state criminal trial, and the hospital records. Officer Ryan Woods (who initially attempted to pull Ellis over for a traffic stop) could not attend the evidentiary hearing, as he is currently on active duty with the United States Army and has been deployed overseas. As such, the court reviewed Officer Woods' deposition and finds that his deposition testimony is also consistent with that of the other witnesses and evidence of record.

The plaintiff Robert Ellis did not, however, make a credible witness. First, his blood alcohol content was 0.218 percent when it was measured later at the hospital – a fact consistent with his inebriated appearance in the dashboard camera video. Second, at least by the point during the video where cocaine powder was visible in Ellis' mouth and on his lips, Ellis was also under the influence of cocaine. For these reasons, his memories of the events of that night are suspect due to the altered perception from cocaine and alcohol. As further evidence of his clouded memory and judgment, Ellis was intoxicated while driving with a suspended license with a bag of cocaine in his pocket when Officer Woods first saw him that night.

Ellis also compromised his credibility when he tried to explain how he got so far away from his vehicle when he was arrested. He claimed in his pleadings that Officer Woods ordered him to get out of the car, get his hands up, turn around, and step away from the vehicle. Ellis claimed in his complaint that he complied with these orders, but Woods nonetheless fired the Taser at him, disabled him, and two police officers tackled him. Ellis gave two different accounts of these events during his testimony at the evidentiary hearing, however. After hearing the defendant officers testify that Ellis was thirty to forty-five yards from his vehicle when he was placed into custody, he testified that he was standing by his vehicle when the Taser knocked him about fifteen yards from the car he was driving. However, when asked on cross-examination how he ended up some fifteen yards from his car, he answered that he backed away from the car because he was ordered to do so. These statements are inconsistent with the allegations in his complaint and with each other, and, together with his powerful incentive to evade capture (explained below), make it far more likely that he simply fled from the vehicle when pulled over. The court thus finds Ellis' testimony about how he got so far from his vehicle not to be credible.

Finally, when asked on cross-examination why he did not simply spit out the bag of cocaine when ordered to do so by the police, Ellis responded that he wished to exercise his right to remain silent and that he did not see the need to spit it out. This proffered explanation strains credulity beyond repair. His first answer is not reasonable because Ellis could have spit out the bag of cocaine without uttering a word – thus exercising his right to remain silent. His second answer is not reasonable because ingesting large amounts of cocaine can be harmful, even fatal. Even if Ellis had alleged that he did not know of the dangers of cocaine ingestion, the video showed the defendants telling him repeatedly to spit out the bag of cocaine because ingesting it

could give him a heart attack and kill him.

Ellis had a powerful motivation to flee the police in his vehicle, then on foot, and then to hide or dispose of the cocaine in his mouth by any means necessary. Ellis had been convicted of four felonies before his involvement in this incident. Thus, had Ellis been arrested in possession of eight grams of cocaine (the amount his girlfriend believed he had), he would have faced an extremely long sentence with no possibility of parole. The maximum sentence for possession of two grams, but less than ten grams, of cocaine under MISS. CODE ANN. § 41-29-139 is sixteen years in the custody of the Mississippi Department of Corrections. As Ellis had been convicted of at least two prior felonies and sentenced to serve more than a year on each, he would also have met the requirements of Mississippi's habitual offender statute, MISS. CODE ANN. § 99-19-81, which would set the sentence to be the maximum permitted under the statute (sixteen years) without the possibility of parole. In addition, the trial judge would have had the discretion to *double* the sixteen year mandatory sentence under MISS. CODE ANN. § 41-29-147 because one of Ellis' previous crimes was a drug crime. *See Jones v. State*, 523 So.2d 957 (Miss. 1988) (holding the use of multiple enhancements of a sentence in this fashion is permissible). As such, had Ellis been arrested in possession of eight grams of cocaine, he faced exposure to a mandatory, day-for-day sentence of thirty-two years. Only Ellis knows the true motivation for his actions on the night in question, but knowledge of the long prison sentence awaiting him for possession of eight grams of cocaine would explain why he risked dying of a drug overdose by chewing and attempting to swallow the bag of cocaine, rather than spitting it out as he was ordered to do.

## Excessive Force

Review of the plaintiff's excessive force claim is limited to the time between his exit from his vehicle and the time he first appears on the dashboard camera video. The court has already decided all other issues in this case. Given the facts determined by the credible testimony and documentary evidence, Ellis's claim of excessive force against the defendants must fail. Every claim "that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (emphasis in original). To determine the reasonableness under the Fourth Amendment of the force used during a seizure, the court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the government's interests. *Id.* at 396. The court must view the totality of the circumstances, including (1) the severity of the crime, (2) whether the suspect poses an immediate threat to the safety of the officers, himself, or others, and (3) whether the suspect is actively resisting arrest, or trying to flee from the officers. *Id.* Courts must not use the crystal clarity of hindsight when determining whether the force used was reasonable, taking into account that law enforcement officers must often "make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force" necessary in each situation. *Id.* at 397. The standard is one of *objective* reasonableness in light of the circumstances confronting the officer at the time; the arresting officer's good or ill intent is not relevant. *Id.*

Under this standard, the amount of force the defendant officers used against Robert Ellis was reasonable; the *Graham* factors weigh heavily against Ellis in this case. Ellis was intoxicated while driving (posing a threat to himself and others), fled from the police in his vehicle and on foot (fleeing from police), lunged at Officer Woods (posing a threat to the officer), fled again even after being shocked with one probe of a Taser (fleeing from police), refused to spit out the bag of cocaine in his mouth (posing a threat to himself), and physically resisted the efforts of the defendant officers to control him, even after he had been restrained in handcuffs (resisting arrest and posing a threat to himself and the officers). The credible evidence presented in this case thus weighs against the plaintiff on his sole remaining claim. As such, the undersigned respectfully recommends that judgment be entered for the defendants on this claim.

## Handling of Objections, Acknowledgment of Receipt

The court refers the parties to 28 U.S.C. § 636(b)(1)(B) and Fed. R. Civ. P. 72(b) for the appropriate procedure in the event any party desires to file objections to these findings and recommendations. Objections are required to be in writing and must be filed within ten (10) days of this date, and "a party's failure to file written objections to the findings, conclusions, and recommendation in a magistrate judge's report and recommendation within 10 days after being served with a copy shall bar that party, except on grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court . . . ." *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (*en banc*)(citations omitted); *see also United States v. Carrillo-Morales*, 27 F.3d 1054, 1061-62 (5th Cir. 1994), *cert. denied*, 513 U.S. 1178, 115 S.Ct. 1163, 130 L. Ed. 1119 (1995).

The plaintiff is directed to acknowledge receipt of this report and recommendation by signing the enclosed acknowledgment form and returning it to the clerk of the court within ten (10) days of this date. The plaintiff is warned that failure to comply with the requirements of this paragraph may lead to dismissal of this lawsuit under Fed. R. Civ. P. 41(b) for failure to prosecute the claim and for failure to comply with an order of the court.

Respectfully submitted this 15th day of September, 2009.

/s/ S. Allan Alexander
UNITED STATES MAGISTRATE JUDGE